MARTIN MAAS AND OTHERS, RESPONDENTS, v. THE MISSOURI, KANSAS AND TEXAS RAILWAY COMPANY AND THE UNION TRUST COMPANY OF NEW YORK, APPELLANTS.

*Liability of company, for stolen bonds — Forgery.*

Nine bonds were stolen from the T. and N. R. R. Co. At the time they were taken they were incomplete; the seal of the company, and the certificate of the Union Trust Company requisite to their validity, not having been affixed. Subsequently these were forged and affixed to the bonds, and the same were purchased by the plaintiff for value, and in good faith. In an action brought by him upon the bonds, *held,* that the company was not liable thereon.

This action was brought against the first-named defendant, which had agreed to replace the bonds of the T. and N. R. R. Co. by its own. The referee decided that it should issue new bonds for those held by plaintiff, and pay to him $3,780, the difference between the value of its bonds, when a demand for them was made, and the value at the time of the trial. *Held,* that this was error; that, if entitled to recover at all, the plaintiff might have either the new bonds, or their market value with damages for the diminution of value from the time of the demand to the time of the decision, but that he could not have both the bonds and the damages.

APPEAL from a judgment in favor of the plaintiff, entered on the report of a referee.

The action was brought to compel defendants to issue to the plaintiffs first mortgage bonds of the Missouri, Kansas and Texas Railway Company, certified by the Union Trust Company of New York, in exchange for the surrender of certain alleged bonds of the Tebo and Neosho Railroad Company.

On the 1st day of June, A. D. 1870, the Tebo and Neosho Railroad Company executed a mortgage on its railroad to secure an issue of 2,000 bonds of $1,000 each, payable June 1, 1903, with interest, etc.

By the terms of the mortgage each of these bonds had to be properly signed and sealed by the railroad company, and also to be certified by the trust company, to be one of the series secured by the mortgage before the bond became obligatory on the railroad company.

Each of the bonds contained the following clause :

" This bond shall not become obligatory until it shall have been

authenticated by a certificate indorsed thereon, duly signed by the trustee aforesaid."

And the *testatum* clause of each bond was as follows:

" In witness whereof the said Tebo and Neosho Railroad Company has caused its corporate name and seal to be hereunto affixed by its president and secretary on the 1st day of June, 1870."

The railroad company had caused these 2,000 bonds to be prepared and printed, and on or before August 8, 1870, the nine bonds in question had, with other bonds, been signed by the president and secretary with the intent and for the purpose of being duly sealed with the corporate seal and then transmitted to the office of the trust company for certification.

In this condition the bonds were stolen. The corporate seal of the company never was affixed to them, but a fabricated seal, in imitation of the genuine one, was affixed without the knowledge or order of the railroad company.

These bonds never came to the possession of the trust company, but the signature of the president of the trust company was forged to the certificate.

These nine bonds were never sold or put in circulation by the railroad company, nor did the said company ever receive any consideration for said bonds, and at the time of the making of the series of 2,000 bonds the railroad company had contracted for the building of its road, and had agreed to give to its contractors the whole of the issue of 2,000 bonds.

The persons who stole these bonds, after forging the corporate seal and the signature of the president of the trust company, put the bonds on the market and on the 13th of July, 1872, they were purchased by the plaintiffs for the sum of $8,280, being at the rate of ninety-two per cent.

On the 19th October, 1872, the Tebo and Neosho Railroad Company conveyed a large portion of its road to the Missouri, Kansas and Texas Railway Company, subject to the before-mentioned mortgage.

On the 1st of February, 1871, the Missouri, Kansas and Texas Railway Company executed to the Union Trust Company a mortgage on its railroad to secure an issue of some 14,000 bonds of $1,000 each.

This company has also become the grantee of the railroad of a corporation known as the Union Pacific Railway Company, southern branch, and the said Union Pacific company and the Missouri, Kansas and Texas company had executed mortgages on their respective roads to secure issues of bonds prior to the above-mentioned mortgage of February 1, 1871.

This mortgage of February 1, 1871, was intended to be a consolidated mortgage and to call in and take up the bonds of the three prior mortgages, respectively, _i. e._, the Tebo and Neosho, the Union Pacific and the Missouri, Kansas and Texas mortgage, and to issue consolidated mortgage bonds in place thereof; and to effect that purpose it provided, that 7,345 of the 14,000 bonds should be reserved to call in and exchange for the said Tebo, Union Pacific and old Missouri, Kansas and Texas bonds.

Of these 7,345 bonds 2,000 had been executed by the railway company, and delivered to the trust company for purposes of exchange for Tebo and Neosho bonds, prior to the commencement of this action.

Since the commencement of this action the railway company has issued and delivered to the Land Grant Railway and Trust Company, its contractor, nine bonds, secured by the mortgage of February 1, 1871, in place of the nine Tebo and Neosho bonds supposed to have been lost, and in order to make up the full 2,000 bonds that the construction company was to receive.

The trust company has exchanged 1,639 of the 2,000 Missouri, Kansas and Texas consolidated bonds appropriated for exchange for Tebo and Neosho bonds for the same number of Tebo and Neosho bonds, and it has 361 left unexchanged.

On the 13th July, 1872, plaintiffs offered to the defendant railway company the nine bonds in suit with a request to have them exchanged for defendants' consolidated bonds. Defendants' secretary received and receipted for said nine bonds and they were, thereupon, put in possession of the trust company, where they now remain, and delivery of consolidated Missouri, Kansas and Texas bonds therefor has been refused.

When the suit was commenced Tebo and Neosho bonds were worth ninety-two and the consolidated bonds par. At the time of the trial both bonds were worth but forty-nine per cent.

On these facts the referee gave judgment that the defendants issue and deliver to the plaintiffs nine consolidated bonds in place of the nine Tebo and Neosho forged bonds, and, in addition, awarded damages against the defendant railway company for the difference between the price paid by plaintiffs for the nine bonds and the value of Tebo and Neosho valid bonds at the time of the trial.

*Wheeler H. Peckham,* for the appellants.  The plaintiff cannot recover because the bonds had never been delivered; had never had any legal inception. (*Lansing* v. *Gaines,* 2 Johns., 302, *et seq.; Marvin* v. *McCullom,* 20 id., 288; Edw. on Bills, 186; *People* v. *Loomis,* 4 Denio, 380–384; *Coddington* v. *Gilbert,* 17 N. Y., 490; *Whitney* v. *Snyder,* 2 Lans., 477, 478; *Foster* v. *McKinnon,* 4 L. R., C. P., 704; *Caulkins* v. *Whisler,* 29 Iowa, 495; *Wait* v. *Pomeroy,* 20 Mich., 425; *Bunson* v. *Huntington,* 21 Mich., 415; *Grover* v. *Clark,* 21 La. An., 567; *Lenheim* v. *Wilmerding,* 55 Penn. St., 73; *Hall* v. *Wilson,* 16 Barb., 55; *Ledwich* v. *McKim,* 53 N. Y., 312.)

*A. R. Dyett,* for the respondents.  The nine first mortgage bonds of the Tebo and Neosho railroad were negotiable, and the plaintiffs *bona fide* holders thereof for value, as those terms are understood in the law merchant. (*Brainard* v. *N. Y. and H. R. R. Co.,* 25 N. Y., 496; *Bank of Rome* v. *Village of Rome,* 19 id., 20; *Mercer County* v. *Hackett,* 1 Wall., 83; *Birdsall* v. *Russell,* 29 N. Y., 220, and cases cited by Russell; Arg., 228–230, 232; *Finnegan* v. *Lee,* 18 How. Pr., 186; *Hubbard* v. *N. Y., etc., R. R. Co.,* 14 Abb., 275.) Although a party be induced by fraud, or even duress, to sign an instrument, and although he never delivered or intended to deliver it, yet, if when he signed it he knew what he was signing, and intended to sign just such an instrument, the decisions are uniform, that in such a case he is liable to a *bona fide* holder for value, though the instrument was stolen from his possession, or otherwise fraudulently put in circulation, where there is nothing on the face of the instrument to excite the suspicion of ordinary men, and the purchaser is not required to closely or critically examine it. (*First Nat. Bk.* v. *Green,* 43 N. Y., 298; *Hyer* v. *Dorchester Bank,* 11 Cush., 51; *Duncan* v. *Scott,* 1 Camp., 100; *Dutchess Co., etc., Ins. Co.* v. *Hatchfield,* 8 N. Y. S. C., 675; *Worcester Bank* v. *Dorchester, etc.,* 10 Cush.

488; *Sybell* v. *Nat. Currency Bank*, 54 N. Y., 288; *Vale* v. *Parker*, 6 Wend., 615, 620; *Putnam* v. *Sullivan*, 4 Mass., 45; *Matthews* v. *Mass. Nat. Bk.*, Am. Law Reg. [March, 1875], 153; Pars. on Bills, 114, cited at pp. 314, 315, 317 of *Foster* v. *McKinnon*, L. R., 4 C. P., 704; *Young* v. *Grote*, 4 Bing., 253; Byles on Bills [6th ed.], 292, note *a* and note 1, and *Rex* v. *Revett*, cited at p. 103; *Murray* v. *Gardner*, 2 Wall., 10; *Ingham* v. *Primrose*, 28 L. J. [C. P.], 295; 7 C. B. [N. S.], 82; *Montague* v. *Perkins*, 22 L. J. [C. P.], 188; S. C., Jurist, vol. 17, pt. 1; *Van Duzer* v. *Howe*, 21 N. Y., 531; *Avoden* v. *Dixon*, 6 Exch., 869; *Magee* v. *Badger*, 34 N. Y., 247; *Scholey* v. *Ramsbottom*, 2 Camp., 485; *Bank Com.* v. *Curry*, 2 Dana, 122; *Moody* v. *Threhild*, 13 Ga., 55; *Shipley* v. *Carroll*, 45 Ill.; *Welsh* v. *Sage*, 47 N. Y., 143, 146; *Goodman* v. *Linard*, 25 How. [U. S.], 343; *Briggs* v. *Ewart*, 51 Miss., 245; *Aull* v. *Colket*, N. Y. Weekly Dig., vol. 2, p. 30; *Helvese* v. *Hibernia Bank*, id., 517; *Citizens' Bank* v. *Smith*, id., 147.) It is immaterial that those nine bonds were not sealed with the genuine seal of the railroad company. The mortgage under which they were given was sealed. A seal was not necessary to their validity as obligations of the company. (37 Me., 349; 12 Mich., 138; 3 Miss., 385; 19 Johns., 60; *Barnes* v. *Ontario Bank*, 19 N. Y., 63.)

DAVIS, P. J.:

It is very clear from the findings of the learned referee, that at the time the nine bonds in question were stolen, they were of no force as obligations against the Tebo and Neosho Railway Company. They were in course of preparation by that company, with the design to issue them as bonds when they should be completed. The corporate seal had not been affixed, nor had the certificate of the Union Trust Company, which was a prerequisite of their validity, been made.

In that condition no person could have enforced them against the railroad company, for there is no possible ground or reason for asserting that they had become its valid obligations, and their invalidity clearly appeared upon their face. At the time they were taken from the possession of the company they were mere waste paper, into whosesoever hands they might come. The learned referee finds that after the bonds were stolen, the seal of the company was forged by

some person, and affixed in apparent due form to each of the bonds, and that the signature of the president of the Union Trust Company was also forged to each of the certificates. This made them apparently valid instruments upon their face, and the plaintiffs became purchasers of them while in that condition, in good faith and for value. They now seek to compel the defendants, the Missouri, Kansas and Texas Railroad Company, to issue other bonds in place of the nine bonds in question, in pursuance of a contract of consolidation between that company and the Tebo and Neosho company, by which they were to take up the outstanding bonds of the Tebo and Neosho company and replace them with their own. The question is precisely as though the action was brought upon the nine bonds against the Tebo and Neosho Railway Company.

It is well settled law, that where the bonds of a railway company have come into the hands of a *bona fide* purchaser, for value, they may be enforced by such purchaser against the company, notwithstanding they have, in fact, been stolen from some former holder, or from the company itself. But we think, in no case has it been held that instruments, purporting to be bonds of a railroad company, but which are in fact forgeries, and never had any legal inception as obligations of the company, can be enforced as valid bonds, because the forgery has been so skillfully performed as to deceive an innocent purchaser.

It seems to us unnecessary to enter upon an examination of the numerous cases bearing more or less nearly or remotely upon the question. It is enough, we think, to constitute a perfect defense, that the corporation is able to say, " these are not bonds, ever made, or issued by us, but are forgeries, upon which no liability ever existed or arose against us."

It is not shown or claimed in this case, that the bonds in question were ever issued by the railway company in any form, or were ever completed so as to have the form of apparent obligations, and while in that condition lost or stolen ; or that any consideration whatever, had ever been received by such company for them, or that the company had ever ratified or confirmed the instruments, or done any act to induce the purchase of them by the plaintiffs, which can estop them from asserting that the instruments are forgeries. It is not a case where a person has stolen the completed

bonds of a company, which have been issued or are ready to be issued as perfect obligations; but one in which papers inchoate and incomplete, bearing upon their face the evidence of that condition and nothing more, and which can have the semblance of perfected obligations only by means of forgery, have been stolen and by some person made to bear the appearance of validity and genuineness by criminal acts of forgery.

In such a case there is no reason, either on authority or in principle, for holding that the victim of the theft of the incomplete and valueless instruments shall compensate persons, who may have been deceived and defrauded by means of the subsequent forgery. If that shall be held, there is no reason why all forged paper shall not be adjudged valid in the hands of *bona fide* purchasers for value, against all persons whose names shall be simulated upon it. We are of opinion that the learned referee ought, upon the facts found by him, to have directed judgment for the defendants instead of for the plaintiffs.

The referee erred also, we think, in awarding the measure of damages given to the plaintiffs, and for which judgment has been entered.

The judgment requires that the defendants, the Missouri, Kansas and Texas Railway Company, deliver to the plaintiff nine bonds of $1,000 each, with semi-annual interest coupons attached thereto, payable on the first day of June, 1903, in gold, and in addition, that the company pay $3,870 — being the difference between the amount the plaintiff paid for the nine bonds of the Tebo and Neosho company on the 12th of July, 1872, and the value of the Missouri, Kansas and Texas Railway Company bonds, at the date of the referee's decision. That this measure of damages is incorrect seems, to us, clearly apparent from a statement of its effect upon the defendants. The Missouri, Kansas and Texas Railway Company, are presumed, in the absence of evidence, to be perfectly responsible and able to pay the interest on the bonds issued, as it shall mature, and the principal when it falls due. But in addition to the $9,000 in gold and interest, which they will covenant to pay by the delivery of their bonds, they are required to pay presently the additional sum of $3,870, as a depreciation of the net market value between the date of the demand made by the plaintiffs for

such bonds and the date of their delivery. This is upon the assumption that the plaintiffs will dispose of the bonds at present market value, and thereby themselves suffer that amount of loss. The assumption may be true or false; but its truth is established by no evidence in the case. But if it were, it is still apparent that the defendants will be required to pay the full amount of these bonds at maturity, as well as the accruing interest up to that time, either to the plaintiffs or to whomsoever may then be holders of the bonds. Discharging that obligation is the performance of their whole duty, and will put the holders of the bonds in possession of all that could ever have been claimed or enforced upon them, had no question been raised as to the validity of the bonds, and all that could ever have been collected upon the original instruments in any event. But the result of the judgment is, that in addition to their paying their obligations in full, the defendants shall also pay the amount above named. If the market value of the bonds shall be increased to par by a change in the market within a month or a year, no provision whatever is made by which the defendants shall have any benefit of this sum of $3,870 ; nor if they are ready to pay the obligations in full at their maturity, as they will be bound to do, is any provision made by which this large amount now paid can inure to any extent to their benefit. It might well be, that if the plaintiffs were entitled to recover at all in the case, they could elect whether to have bonds actually issued to them or their market value, with damages by reason of the diminution, from the time of the demand until the time of the decision. But that they can do both, to wit; be placed in a position in which they are entitled to the full par value of the bonds and all present and accruing interest, and at the same time to a purely imaginary loss, which they have not in fact sustained, but may sustain if they choose not to keep the bonds, but put them upon the present market is, we think, going beyond the measure of damages that would do exact and equal justice between the parties.

Under the rule adopted by the learned referee, if the bonds had ceased to have any *present* market value, the plaintiffs could recover $9,000 in gold and all the interest that has accrued thereon, and have delivered to them in addition to such recovery, nine bonds of $1,000 each, payable in gold, with semi-annual interest coupons,

and be entitled to the whole amount thereof at the maturity of the bonds. Such a result could not be sound either in law or morals.

For these reasons, also, we think the decision of the learned referee cannot be upheld. The judgment should be reversed and a new trial granted, with costs to abide the event.

BRADY and DANIELS, JJ., concurred.

Judgment reversed, new trial granted, costs to abide event.